**SYNERGY WORLDWIDE, INC., Plaintiff,**

v.

**LONG, HAYMES, CARR, INC., Defendant.**

**No. Civ.A.1:97–CV–1883–TWT.**

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 29, 1998.

James Christie Busch, Chad Kenneth Reed, Jackel Rainey Marsh & Busch, Marietta, GA, for Synergy Worldwide, Inc., plaintiff.

Paul Joseph Murphy, James C. Snyder, Jr., King & Spalding, Atlanta, GA, Vernadette Ramirez Broyles, Hunton & Williams, Atlanta, GA, for Long, Haymes, Carr, Inc., defendant.

## ORDER

THRASH, District Judge.

This case is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 37] and Defendant's Motion to Strike [Doc. No. 49]. As a preliminary matter, the Court denies Defendant's Motion to Strike. However, the Court will consider only that evidence which is proper and admissible. Considering that evidence, and for the reasons set forth below, the Defendant's Motion for Summary Judgment should be granted.

### I. BACKGROUND

This case arises out of a contract for the sale of radio advertisements. Plaintiff Synergy is an advertising broker based in Georgia that specializes in the placement of advertising in barter transactions. Defendant Long Haymes Carr, Inc. (hereinafter "LHC") is a North Carolina advertising agency which represented Kiwi International Airlines. LHC arranged for Kiwi to purchase advertising through Synergy in a barter transaction. In return for the advertisements, Synergy agreed to be paid in "Kiwi credits." These credits could be redeemed for Kiwi tickets. They could also be transferred or sold. LHC also received its commission from Kiwi in Kiwi credits. For about two months in the summer of 1996, Synergy provided over $200,000 in advertising and received Kiwi credits as payment. Shortly thereafter, Kiwi filed for bankruptcy. As a result of the bankruptcy, the Kiwi credits became worthless. Synergy now seeks payment for the advertising from LHC, contending that LHC is jointly and severally liable for Kiwi's obligations. LHC claims that there is no enforceable contract binding it to guarantee the value of the Kiwi credits.

Synergy dealt with Ms. Melody Willis as the agent for Kiwi. She was hired in April, 1996, one year out of college, to work as a media planner for LHC. In the advertising business, media planners are low-level employees with limited authority. As a media planner, Ms. Willis' responsibilities included analyzing market information, planning marketing actions for LHC's clients, and ordering client-approved advertising for these clients from media vendors such as Synergy. LHC

assigned Ms. Willis responsibility for creating a media plan for its client, Kiwi. As a media planner, Ms. Willis had limited authority to sign contracts on behalf of clients in purchasing pre-set amounts of advertising. Advertising is often purchased in this way by signing documents known as insertion orders. Insertion orders briefly describe the amount and type of advertising to be run. Ms. Willis' authority to sign contracts on behalf of her employer, LHC, was more limited. Unless the document was an LHC form contract, Ms. Willis had to seek approval from LHC's legal counsel before signing any documents binding LHC.

In the spring of 1996, Kiwi faced financial difficulties and wanted to purchase advertising with credit instead of cash. Aware of Synergy's willingness to barter, Ms. Willis contacted Synergy on behalf of Kiwi. On July 15, 1996, Ms. Willis signed two insertion orders for Synergy to place radio advertisements for Kiwi. Together, the insertion orders authorized up to $500,000 in radio spots. These orders required Kiwi to pay Synergy one credit for every dollar of advertising. The insertion orders also stated that "[c]redits are all subject to availability." (Doc. 44, Exhibit A). Synergy concedes that Ms. Willis acted "on behalf of and as agent for Kiwi" in signing the July 15 orders. (Doc. 44, p. 4). The July insertion orders do not contain a joint and several liability clause and impose no obligations on LHC. It is undisputed that the July 15 insertion orders were valid contracts. Although Synergy admits that these orders were valid contracts, it contends that the July 15 insertion orders do not represent the final agreement of the parties. Synergy contends the July 15 insertion orders were "rough outlines" for the placement of advertising.

The relationship between LHC, Synergy and Kiwi differed from a typical advertising arrangement. Customarily, an advertising agency like LHC would place advertising for its client—in this case Kiwi—with a media vendor. After the advertising ran, the client would then pay LHC for the full amount of the advertising including commissions. LHC—the broker—would then deduct its commission and pay the media vendor—Synergy—money due for the advertising. This arrangement is known as sequential liability in the advertising industry. Under such an arrangement, LHC would be liable to the media vendor if LHC received full payment from its client. Kiwi's arrangement with Synergy differed in that Kiwi was to pay the Kiwi credits directly to Synergy. Likewise, LHC would receive its commission directly from Kiwi.

On July 16, 1996, Synergy began performing pursuant to the insertion orders. It placed over $200,000 worth of radio advertising in several cities served by Kiwi. Soon thereafter, Synergy's president, Mark Dagel, became concerned about the financial condition of Kiwi based on new reports of Kiwi's financial troubles. In order to hedge against Kiwi's financial instability, Mr. Dagel threatened to stop running Kiwi's advertising unless Kiwi agreed to increase Synergy's compensation to two Kiwi credits for every dollar of advertising. Kiwi acquiesced and in late August began paying Synergy at the 2 to 1 ratio.

On August 10, 1996, an independent contractor for Synergy, Ira Mihlstin, visited Ms. Willis in North Carolina. Mr. Mihlstin presented her with two new insertion orders and a Synergy form contract for placement of the advertising required by the July 15 insertion orders. Synergy remained obligated to provide up to $500,000 in advertising. For Kiwi and LHC, these new documents made three changes. First, the August 10 insertion orders increased Kiwi's obligation to two Kiwi credits for each dollar of advertising Synergy placed. Second, both the August 10 insertion orders and the form contract provided that the credits paid to Synergy would have no expiration date and could be exchanged for Class V tickets, a more desir-

able booking class. Finally, the form contract contained a joint and several liability clause. The clause provided that "both Advertiser as agent and client as principal agree and shall be jointly and severely (sic) liable for the performance of this agreement including all payments, rebillings, adjustments, and other terms and conditions."

According to Ms. Willis, she advised Mr. Mihlstin that she lacked authority to sign the agreements without authorization from Kiwi. Nevertheless, Ms. Willis "scanned" the documents and signed them. It is undisputed that no one else at LHC reviewed or was notified of the existence of the August 10 contracts. Ms. Willis' supervisor, Mr. Trosan, testified that he was unaware of the August 10 documents until after Kiwi filed for bankruptcy in September, 1996. Mr. Trosan also testified that Ms. Willis lacked authority to commit LHC to joint and several liability, as such an obligation would require approval by LHC's counsel or senior officers.

On August 26, 1996 Kiwi transferred $486,601 in Kiwi Credits to Synergy. Kiwi also transferred $56,062 in Kiwi credits to LHC as commission. Following the transfer of these credits, Kiwi sent Synergy a document entitled "Conditions of Barter." These conditions prescribed how the Kiwi credits could be used. Among other conditions, the document stated that ticket value would be computed at Class V rates, required seven day advance purchase, were subject to availability, required written approval of Kiwi to transfer the credits, and restricted the number of barter passengers to six per flight. Between August 26 and September 30, 1996, Synergy used its credits to obtain more than 30 Kiwi tickets. Synergy also authorized the transfer of some of its credits to other companies. In all, Synergy used about $7,000 worth of its credits for Kiwi tickets and transferred $14,000 to other companies. On September 30, 1996, Kiwi announced that it had filed for bankruptcy protection. Ms. Willis advised Synergy on October 2, 1996, to stop additional advertising for Kiwi. Synergy was left with roughly $377,000 in worthless Kiwi credits. Synergy admits it is due payment only for the advertising that actually ran. LHC claims that at most $205,000 worth of advertising ran. Synergy claims it provided about $262,000 worth of advertising.

Synergy also alleges that Ms. Willis made fraudulent statements concerning Kiwi's financial condition to induce them into the agreement. Synergy's president, Mr. Dagel, claims that Ms. Willis, in a July, 1996, phone conversation, stated that Kiwi was financially viable and would receive a cash investment of $10 million. Ms. Willis also allegedly told Mr. Dagel that LHC had researched Kiwi's financial condition and was confident in taking its commission in Kiwi credits. Mr. Dagel also alleges that Ms. Willis made similar comments several weeks later in another phone conversation. Despite these comments, the evidence shows that Synergy knew of Kiwi's financial troubles when it entered the contracts.

Synergy sued LHC in May, 1997, in State Court in Cobb County, Georgia to collect for the advertising. Synergy asserted claims for breach of contract based on nonpayment in Count 1 and wrongful cancellation in Count 2. LHC removed the action to this Court based on diversity of citizenship and an amount in controversy exceeding $75,000 pursuant to 28 U.S.C. § 1441(a) and (b). Synergy filed an Amended Complaint adding a fraud claim in Count 3, seeking punitive damages in Count 4, and seeking recovery based on *quantum meruit* in Count 5. Synergy dismissed Count 2. LHC moves for summary judgment on the remaining counts. It is undisputed that Georgia law applies to these claims.

## II. SUMMARY JUDGEMENT STANDARDS

Summary judgement is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgement as

a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgement must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. Breach of Contract

Synergy seeks recovery for nonpayment and breach of the "August 10" contract.[1] It is undisputed that LHC can only be liable to Synergy for breach based on the August 10 contract, which contains a joint and several liability clause. If valid, the August 10 contract would make LHC liable for Kiwi's obligations to Synergy. The July 15 insertion orders do not contain a joint and several liability clause. LHC argues that these control.

LHC raises three defenses against its joint and several liability with Kiwi under the August 10 contract. First, LHC argues that Ms. Willis lacked actual or apparent authority to sign the contract to bind LHC to joint and several liability with Kiwi. Second, LHC argues that even if Ms. Willis had authority to enter the contract, the August 10 agreement fails for lack of consideration. Finally, LHC argues that even if the August 10 contract is enforceable, Synergy has received everything to which it is entitled. The Court will begin its analysis with the issue of authority.

■ LHC is bound by the August 10 contract if Ms. Willis had either actual or apparent authority to enter contracts on behalf of her employer. It is clear that Ms. Willis did not have actual authority to sign the Synergy form contract. Georgia law provides that "[t]he agent shall act within the authority granted to him, reasonably interpreted; if he shall exceed or violate his instructions, he does it at his own risk, the principal having the privilege of affirming or dissenting, as his interest may dictate." O.C.G.A. § 10–6–21. Here, LHC showed that Ms. Willis acted outside the scope of her authority. The LHC employee handbook expressly prohibited LHC employees from signing contracts not approved by LHC's legal counsel. It is undisputed that no one at LHC other than Ms. Willis reviewed or knew of the August 10 contracts before Ms. Willis signed them. Further, the LHC Media Director and Ms. Willis' supervisor, Ray Trosan, testified that he explicitly told the members of the media team, including Ms. Willis, that they did not have authority to sign contracts not drafted by LHC. When asked about the proper procedure Ms. Willis should have followed, Mr. Trosan responded: "She should have issued Long Haymes & Carr contracts. If that was unacceptable, she should have taken the issue up with myself, who would have taken it up with the CFO." (Trosan Dep. at 27). Mr. Trosan also testified that he knew of no other occasion when a media planner signed a non-LHC contract to bind LHC. He explained that media planners can sign contracts on behalf of LHC clients after the client provides written authorization to spend a predetermined amount on advertising. However, under no circumstances was Ms. Willis or any other employee at her level authorized to sign non-LHC contracts to bind LHC.

To counter this testimony, Synergy presented contracts signed by Ms. Willis with other parties to support its claim that she

---

1. For convenience, the Court will refer to the contract which is the subject of this claim as the August 10 contract. There is a factual dispute as to the date that the contract was signed. This dispute is not as to a material fact.

had authority to bind LHC. Aside from evidentiary problems with these documents, a review of these exhibits indicates only that Ms. Willis acted as agent for various clients. The exhibits do not indicate that LHC was bound by any of these contracts. Ms. Willis also testified that she lacked authority to sign the Synergy form contract. Significantly, the August 10 Synergy form contracts were signed by Ms. Willis as the authorized representative of the "Advertiser." Kiwi is identified in the contracts as the "Advertiser." As this evidence was uncontradicted, the Court finds that Ms. Willis did not have actual authority to enter contracts on behalf of LHC.

■ Even if Ms. Willis lacked actual authority, LHC is bound by the August 10 contracts if Ms. Willis had apparent authority. "Apparent authority is that which the principal's conduct leads a third party reasonably to believe the agent has." *Bresnahan v. Lighthouse Mission, Inc.,* 230 Ga.App. 389, 391, 496 S.E.2d 351 (1998). Apparent authority allows third parties to bind a principal to its agent's acts based on the principal's conduct reasonably construed by third parties who innocently rely thereon. *Id.* The conduct of the agent alone cannot bind the principal. The principal must act in such a manner as to legitimate the agent's charade of authority. Here, if LHC created no impression of authority in Ms. Willis, apparent authority is not an issue. *Id.*

■ For a third party to estop the principal from denying its agent's apparent authority, it must appear that "a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent had authority to perform a particular act and deals with the agent upon that assumption." *Addley v. Beizer,* 205 Ga.App. 714, 720, 423 S.E.2d 398 (1992). It is undisputed that in the advertising business media planners are low-level employees with limited authority and responsibility. This was the position held

by Ms. Willis. The question remains whether LHC altered this general perception of Ms. Willis' position so that Synergy could reasonably assume she had authority to bind LHC to joint liability with a financially troubled client for up to half a million dollars. Synergy alleges that Ms. Willis represented that she· had authority to enter the contracts. The evidence contains memoranda from Ms. Willis to Synergy containing the terms Kiwi required in the advertising barter. In a May 2, 1996 memorandum, Ms. Willis wrote: "As requested, I am forwarding this official authorization for Synergy ... to work on behalf of Kiwi International Airlines and Long Haymes Carr.... Any further questions should be directed to the media planner at LHC, Melody Willis." (Doc. 44, Exhibit L). This memorandum does not help Synergy's case any more than would a letter from Ms. Willis explicitly stating that she had authority to bind LHC. "It is insufficient, as a matter of law, to find that an agency relationship exists when the evidence shows either that an agency was assumed, or that an inference was drawn based on a purported agent's actions." *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1583 (11th Cir.1986). The law looks to the principal's conduct, not the agent's.

■ To establish apparent agency, Synergy must show conduct by LHC which legitimates Ms. Willis' alleged manifestation of authority. Toward that end, an independent contractor for Synergy, Ira Mihlstin, testified that on August 10, 1996 during his trip to North Carolina, Ms. Willis introduced him to the president of LHC at a coffee shop. Mr. Mihlstin testified that LHC's president said of Ms. Willis: "This is the girl. She's the one that runs everything. Make sure she takes care of you." These comments, however, were made after Mr. Dagel, Synergy's president, signed the August 10 contract. Mr. Dagel signed the contract on July 25 in Atlanta. The document was then brought by Mr. Mihlstin to North Carolina

for Ms. Willis to sign on August 10.[2] Assuming Mr. Mihlstin's testimony is accurate, Synergy could not have based its decision to sign the August 10 contract in reliance on comments not yet made by LHC's president. Further, the Court finds these statements alone would not allow Synergy reasonably to conclude that a young media planner could obligate the agency for the debts of its client. Synergy also contends that it "trust[ed] in the authority and professionalism of Melody Willis" based on her previous position with another employer. But again, Synergy must show conduct by LHC. The conduct of a previous employer of LHC's agent—presumably a competitor—cannot bind LHC. The Court finds no evidence from which a reasonable trier of fact could determine that Synergy reasonably believed Ms. Willis had authority to bind LHC.

▆▆▆▆ Synergy could still recover under the August 10 contract if LHC ratified Ms. Willis' conduct. A ratification by the principal relates back to the agent's act as if the principal originally authorized the act. O.C.G.A. § 10–6–52. Ratifications may be express or implied from the acts or silence of the principal. *Id.* Here, Synergy contends that LHC ratified the August 10 contract by accepting its commission from Kiwi. However, LHC was entitled to receive a commission from Kiwi based on the July 15 insertion orders. Acceptance of something to which LHC was already entitled does not ratify a separate contract. Further, uncontradicted testimony shows that LHC did not know the August 10 contract existed until after Kiwi filed for bankruptcy in September 1996, which was after LHC received its commission on August 26, 1996. To ratify an agent's act, Georgia law requires that the principal be aware of all relevant material facts before or at the time of ratification. *Bresnahan*, 230 Ga.App. at 391, 496 S.E.2d at 354. *See also Hyer v. Citizens & Southern Nat'l*

*Bank,* 188 Ga.App. 452, 453, 373 S.E.2d 391 (1988) (holding that ratification necessarily implies complete knowledge of all material facts relating to the transaction).

▆▆▆▆ Synergy also contends that LHC ratified the August 10 contract by filing a claim in bankruptcy court. LHC filed a claim in Kiwi's bankruptcy proceedings because it too was left with worthless Kiwi credits as payment for its services. Again, the benefits which LHC sought in bankruptcy were those due under the July 15 insertion orders. LHC's effort to protect that which was due under a prior contract does ratify a new and unauthorized contract. The Court finds as a matter of law that LHC did not ratify Ms. Willis' signing of the August 10 contract. There being no issue for a trier of fact, LHC's motion for summary judgment on the breach of contract claim should be granted.

▆▆▆▆ Plaintiff's breach of contract claim fails for an additional reason. Synergy admits that it received $486,000 worth of Kiwi credits from Kiwi. It has received everything that it was entitled to under the August 10 contracts. The adequacy of the consideration received must be judged at the time the contract is executed. *Saine v. Clark,* 235 Ga. 279, 280, 219 S.E.2d 407 (1975). Synergy received the benefit of its bargain. There is nothing in any of the contracts whereby Kiwi or LHC guaranteed that the Kiwi credits would maintain a certain monetary value. Any barter transaction entails risk that the property received will diminish or lose its value. The fact that the Kiwi credits later became worthless does not transform this pure barter transaction into something else.

## B. Fraud (Count 3)

▆▆▆▆ Synergy asserts a claim of fraud based on alleged statements by Ms. Willis about Kiwi's financial condition. In Geor-

---

**2.** Synergy alleges that Ms. Willis actually signed the contract on July 25 during a trip to

Atlanta.

gia, the tort of fraud requires five elements: (1) a false representation by the defendant; (2) with scienter, or knowledge of the falsity; (3) with intent to deceive the plaintiff or to induce the plaintiff into acting or refraining from acting; (4) on which the plaintiff justifiably relied; (5) with the proximate cause of damages to the plaintiff. O.C.G.A. § 51–6–1; *Sears Mortgage Corp. v. Leeds Building Products, Inc.,* 219 Ga.App. 349, 464 S.E.2d 907 (1995). To survive a motion for summary judgment, Synergy must offer some evidence from which a jury could find each element of the tort. *Sears Mortgage Corp.,* 219 Ga.App. at 351, 464 S.E.2d 907. Synergy alleges that Ms. Willis repeatedly stated that Kiwi was solvent and that LHC was continuing to perform work for Kiwi. Synergy alleges that Ms. Willis knew these statements were false when she spoke them. Synergy contends that her intent to induce Synergy to rely on these statements can be inferred by the benefit LHC stood to receive. Finally, Synergy offers documentation of advertising run on behalf of Kiwi as evidence of its damages.

 Assuming for purposes of this motion that Ms. Willis made the alleged statements, Synergy's fraud claim fails as a matter of law. First, statements by Ms. Willis as to Kiwi's financial condition constitute an opinion. In Georgia, statements of opinion will not support a claim for fraud. *Simpson Consulting, Inc. v. Barclays Bank, PLC,* 227 Ga.App. 648, 650, 490 S.E.2d 184 (1997); *See also Miller v. Clabby,* 178 Ga.App. 821, 822, 344 S.E.2d 751 (1986) (holding that a buyer could not rely on a seller's mere expression of opinion). Synergy also alleges that Ms. Willis stated that Kiwi would be receiving an infusion of $10 million in capital. Assuming that this investment did not occur (Synergy offers no proof that any of the alleged statements were false when made), Georgia law is clear that statements as to future events cannot support a fraud claim. *Simpson Consulting,* 227 Ga.App. at 650, 490 S.E.2d 184.

 Synergy's claim also fails on the issue of justifiable reliance. Even if the Court overlooks the opinion and speculation comprising the alleged statements, and ignores the lack of evidence that they were made or were in fact false, Synergy was not justified in relying on Ms. Willis' representations. "[T]here is no legal relief afforded when one 'blindly relied on the representations of (another) as to matters of which he could have informed himself.' " *First Union Nat'l Bank v. Gurley,* 208 Ga.App. 647, 649, 431 S.E.2d 379 (1993). *See also State Farm v. Fordham,* 148 Ga. App. 48, 51, 250 S.E.2d 843 (1978) ("[T]he law … demands of everyone that he make use of his own facilities to avoid being defrauded."). Ms. Willis was a low-level employee at an advertising firm soliciting business from Synergy in an arms-length negotiation. Synergy had a duty to inform itself of the fiscal condition of Kiwi before selling advertising on credit. Having failed to perform due diligence, Synergy cannot now turn to another party for compensation.

Moreover, Synergy admits it was aware of Kiwi's financial troubles from the beginning of the parties' relationship. In an August 16, 1996, letter to Ms. Willis, Synergy's president wrote:

> When we first started dealing with any Kiwi media buy, Kiwi had a few planes grounded and there was talk about loosing (sic) additional planes. There was also talk the company could not make it's (sic) payroll and was running out of money … Our risk at doing the media placement up front was that Kiwi may or may not be in business …

(Doc. No. 37, Exhibit G). Flying in an atmosphere of financial uncertainty, Synergy bought advertising and agreed to be paid in "Kiwi credit". Synergy must bear alone the fruits of its assumed risk. The Court finds no genuine issue of material fact to justify Synergy's claims of fraud. Accordingly, LHC's Motion for Summary Judgment on Count 3 of Synergy's Complaint should be granted.

 In Count 4 of its Complaint, Synergy seeks to recover punitive damages from LHC for Ms. Willis' alleged fraudulent misrepresentations. According to Georgia law, granting summary judgment on this claim bars Synergy's claim for punitive damages. "[A] claim for punitive damages has efficacy only if there is a valid claim for actual damages to which it could attach. Punitive damages may not be recovered where there is no entitlement to compensatory damages." *Southern General Ins. Co. v. Holt,* 262 Ga. 267, 270, 416 S.E.2d 274 (1992). LHC's Motion for Summary Judgment should therefore be granted as to Count 4 of Synergy's complaint.

### C. Quantum Meruit (Count 5)

 As an alternative to its breach of contract claim, Synergy seeks to recover from LHC the fair market value of the services rendered to Kiwi based on the theory of *quantum meruit.*[3] To recover on *quantum meruit,* Synergy must show (1) its performance of services valuable to LHC; (2) either at the request of LHC or knowingly accepted by LHC; (3) LHC's receipt of which without compensating Synergy would be unjust; (4) and Synergy's expectation of compensation at the time of the rendition of the services. *Artrac Corp. v. Austin Kelley Advertising, Inc.,* 197 Ga.App. 772, 777, 399 S.E.2d 529 (1990); *See* O.C.G.A. § 9–2–7. While the question of reasonable value of services rendered generally lies with the jury when such value is disputed (*see Sosebee v. McCrimmon,* 228 Ga.App. 705, 707, 492 S.E.2d 584 (1997)), the Court must first decide as a matter of law whether there exists a right to recover at all.

Synergy fails to meet the requirements to recover under *quantum meruit.* Synergy performed no services for LHC. Rather, Synergy provided advertising to Kiwi and was paid directly by Kiwi for those services. Georgia cases clearly distinguish between corporate entities in suits based on *quantum meruit.* In *Artrac Corp.,* 197 Ga.App. at 777, 399 S.E.2d 529, an advertising agency sought payment from two corporations for advertising provided to their predecessor corporations. Of the two new corporations, one had purchased the assets and name of its predecessor and was a wholly owned subsidiary of its co-defendant. The trial court granted summary judgment for defendants on the advertising agency's *quantum meruit* claim. Affirming summary judgment, the Georgia Court of Appeals held that the services performed by the agency were for the predecessor corporation, not the new entities. Therefore, the *quantum meruit* claim could not survive because the agency "could not possibly have held an expectation of compensation" from the new entities. *Id.* Here, Synergy had no reason to expect compensation from LHC. LHC served as an agent of its client, Kiwi, in the same manner as Synergy. Both looked directly to Kiwi for compensation. Both took a risk and subsequent loss by agreeing to accept payment in credit from a financially troubled airline. Because Synergy could not have reasonably expected compensation from LHC, its claim of *quantum meruit* fails as a matter of law. Accordingly, LHC's Motion for Summary Judgment on Count 5 of Synergy's Complaint should be granted.

### IV. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendant's Motion for Summary Judgement [Doc. No. 37] and **DENIES** Defendant's Motion to Strike [Doc. No. 49].

---

**3.** Georgia law permits a claimant "to assert the inconsistent theories of breach of contract and *quantum meruit* in the same action as long as an election is made prior to the entering of the judgment." *Coldwell Banker Commercial Group v. Nodvin,* 598 F.Supp. 853, 857 (N.D.Ga.1984).